Ms. Main is here for the city, and Mr. Pinnow is here for the city, and Mr. Pinnow is here for South Grand View. And Ms. Main, when you're ready, you may proceed. Yes, Your Honor. Good morning. May it please the court, my name is Dana Main. I am here on behalf of the City of Alabaster, Alabama, and we are here today about this topic that is taking up a lot of time in the Supreme Court, and a lot of time in circuit courts, and a lot of time in district courts. When is a takings claim ripe? Well, the courts say that a takings claim is ripe when there's finality. And in this particular case— Exhaustion, I'm gathering after the Nick decision, that exhaustion argument of yours is no longer valid. Your Honor, we had—we did discuss—yes, Your Honor, it is not valid. But in fact, we had not hung our hats on the exhaustion because the state of Alabama has a particular state law that doesn't seem to recognize a takings claim and inverse condemnation claim. So we had not—our appeal had not hung on that part of Nick at all. So when Nick came down this summer, the one thing, importantly, that Nick did not disturb at all is Williamson's finality. And I say Williamson's finality, but there are a lot of cases that brought forward that finality. Your Honor, and Your Honors, there is a—just to go back, we've got four different types of takings claims that this Court has enunciated in the Eadie v. Sarasota case. And our case is one of those. We've got a— Why was it not final? Why was it not final? It's not final because we don't know what the government would do. We don't know what the city would do, what kind of development the city would allow. There has not— They said the development that the developer wanted was garden apartments, which would have been—garden houses, which would have been okay under the previous ordinance. This ordinance says, nope, you can't do that. That sounds pretty final to me. It is not final because there wasn't any particular plat that had been given to the local government to take a look at. And— But if they had put the plat, they'd done a lot of work, spent a lot of money grading for garden units, which would have been permissible under the first zoning. Any plat they presented that would have done that would have been noncompliant with the ordinance. Your Honor, there are a couple things at issue there. One, what they had graded for was not permitted by the ordinance at the time. Their property was zoned R2, R7, and R4. And they then said, well, we graded for R4 because that's what we wanted, that's what we had hoped for, that's what we thought we would be able to get. But the fact is, it was not zoned for that. There had been some testimony in trial, and again, the—and I will point the Court back to the fact that this analysis, the ripeness analysis, can be taken from the very first time that you have a complaint. And so in the complaint, it is the plaintiff's burden to prove that element, that there is—that the case is ripe from the get-go. And these allegations were not part of the complaint. But, Your Honor— But what you're saying is if they come with a plat that called for garden homes, which would have been consistent with the first ordinance, but not the new ordinance, if they call for that, then you're saying that the city may have said, oh, you know, darn, we just passed this ordinance, but okay, we're going to be okay with this. We'll now change our ordinance. That's what you're saying would have happened if they had just been a little more persistent? Your Honor, there was no—they didn't do anything. That's the—the point is that we were in a recession. They had no plans for the property at that moment. The plans for the property were pre-recession, and that was the plat that they had. But again, Your Honor, it was not—it was an aspirational plat. They did not have the zoning, R-4 zoning, on the entire piece of property. It was only about half of the property. And, Your Honor, the rest of it was zoned for townhouses and then for the R-2. So we had an R-2 and R-7, and we had an R-4. And there was testimony during the trial that says, well, you can—with the plaintiff— Well, I mean, we're back to what you're saying they needed to do to make it final. And you're saying they needed to come back with a plat for that which the ordinance would have forbidden. And my practical question is, we know you wouldn't have changed it because you've been in litigation for years at any point. You could have said, you know what, if you'd just mentioned that to us, we're fine with that. But you're still litigating this, which suggests that rightness is not the problem but disagreement with what they wanted to do. Your Honor, and I realize that that is a statement. Why haven't you changed it was something that the trial judge said. But, Your Honor, the city is not going to rezone a piece of property in a vacuum. We—part of the reason why it was rezoned to begin with is because the city knew that the property was going to go—it was in the middle of foreclosure. So we didn't know who the developer was going to be at the time. And it's very significant to the city who was going to be developing the property. What was the timing of the—what was the timing of the foreclosure? It was my understanding that it happened after the property was rezoned. It did happen after the property was rezoned, but it's uncontroverted. It happened—it was in process. It was in process. The default on—there had been several different loans that—this property had millions of dollars of loans on it. And then this property secured—was secured for other pieces of property—I mean, sorry, other loans. The default had—it had been longstanding that the property had been in default. And the— How do you address the AAA Profiles 1 case from this court that talks about the rezoning ordinance at issue was undeniably constituted a final definitive position such that the case was ripe for adjudication? And, yes, Your Honor, this case is not like the AA Profiles case. The AA Profiles case, the owner of the property was using the property. The owner of the property had gotten permission and gotten a permit for woodchipping, had built the woodchipping operation, was operating the woodchipping operation under permit. And then the neighbors got upset about what was going on. The city said—issued an order, said, you've got to stop what you're doing that we permitted before, and then withdrew their permission, their permit to do it, and then rezoned it specifically for the purpose of having that use be not permitted. So at that point, that was a use that was in operation, and the city came in and stopped it in that case. But here you have all this money that was spent on grading. I mean, so there is—there's activity on the property, and the city rezoned because they knew what was coming, and so they wanted to make sure that it was the R2. So how does the distinction you're drawing really matter? Because the property was zoned—I mean, it was graded years and years and years before this rezoning, and had—nothing had happened, and the project itself, because of the recession, had just been dormant. And so—and also, again, the property was graded not as it was zoned, and the zoning ordinance specifically itself says R7 is townhouses. They graded for garden house—garden homes. That—and that was done in 2005-2006. And here we are. Nothing has happened with the property. In fact, it's degrading. There's erosion. There's growth. But the jury didn't buy the city's argument, though. I mean, the case went to trial, and the jury bought the argument that the rezoning that took place in 2011 unanimously by the city council was because the members of the city council's constituents were worried that more townhomes would lower their property values. Well, Your Honor, first of all, ripeness, you never even get to trial. Ripeness, you—it should be a decision. It's a matter of law. If there's no ripeness and the claim is not right, it should not get there. Didn't the city stipulate that all jurisdictional requirements were met before the trial? Your Honor, that was part of the pretrial order, but a question about ripeness goes to the court's jurisdiction, and that can never be waived, and it was raised before the trial started. I understand that. So the city can stipulate to ripeness at the beginning of the trial, sit back and wait and see if it wins, and then object on ripeness grounds later if it loses. Your Honor, that did not happen. Before the very first juror walked into the room, the issue of ripeness was raised by the trial council. It was raised moments before trial started. Yes, Your Honor, it was. In fact, though, an issue about the court's standing could be in jurisdiction, could have been brought up today. Well, as for your ripeness, let's assume we decided it's not right. What's the next step? It's to make it right. So you're saying they would need to then go back and then, what, put a plat through, say, this is what we want to do, and then you'd say, oh, okay, no, no again. And then we already have a jury verdict where we know what the valuation, but you're saying we have to go through this step just to get back to—just to get you a new trial, essentially. Your Honor, we don't know what the jury would—I mean, I'm sorry, what the city would do. We don't know what the city would do with a developer— We don't know much, no, don't we? No, Your Honor, we do not. We do not know. What the city knew at the time of the rezoning was that the property was in foreclosure and somebody was going to come in and take over this 142 acres that was on the hillside. We had no idea what was going to happen with that property. And if the developer and the owner had come in and said, here is our R3 plat. This is what we want to do. Here it is. These are—there are two entrances. It meets all the requirements. Can we have this zoning? That's a very different situation. The city has never had that since 2006 when there was an R4 plat that was given to the city that the city denied, Planning Commission denied. And I see that my time is up. Thank you, Ms. Main. We'll hear from Mr. Pino. Thank you, and may it please the Court. I'm Jeff Pino for South Grandview Development Company. Your Honors, the final decision requirement set forth in Williamson is simply this. It's that the initial decision maker has arrived at a definitive position that inflicts concrete injury upon the land. Now, the city has cited in their brief that it may be the state's decision maker, but that would require something further than what the Williamson Court required, which is just that the initial decision maker, meaning the city council, reach a final decision. Now, the Edie Court holds that the issue of ripeness is fact sensitive. The implication is that there must be some facts before the court that would put the ripeness at issue. The city stipulated or actually said before trial that they were not going to argue that the property could be developed at R2. Likewise, they didn't put on any evidence that it could be developed at R2. This is in holding with the Greenbrier Court that said that even if you apply for a variance, there were no variances available to South Grandview, and that the Board of Adjustments did not have the power to effectively rezone the property. So, it actually is more about than just requesting a variance or filing suit based on estoppel or vested property rights, which, by the way, the Board of Adjustment does not have authority to entertain some of the issues that the city has put forth, such as vested property rights and estoppel. The Board of Adjustments must maintain the spirit of the original ordinance, and there's no way to reconcile those two, keeping an R2, a 90-foot lot, with a 15,000 square feet and a R4 lot, which was only 7,000 square feet. Now, so why not seek a variance from the city? Because, like I said, it's more about just doing that. The undisputed testimony by a conceded giving board, the owner, was that even if you do that, you have slashed our inventory in half. You're trying to put an R2 home on what was previously designed for an R4 lot. You have half the houses. You have no trees left, which an R2 lot normally has as many old growth trees as possible. You have – it's all mass graded. You have no basements, which are with an R2 lot. And you've got houses that don't even comply with the covenants that are already in place. And it would just – it is an atypical configuration, an atypical lot configuration and an atypical home configuration from a marketing standpoint. This is a nightmare. What you argue in your brief is that a variance would be futile. Yes, sir. The city has already made up its mind, so it doesn't make a whole lot of sense to go back and ask the city again, did you really mean what you said earlier? Yes, sir. That is one aspect of the futility. And another one that we hit on as well is that Misgiving Board testified that there was – there's no way to market these lots. Who's the initial decision maker? The city council. The city council is the initial decision maker, right? Yes, sir. And so we look to see whether or not the decision of the initial decision maker is final. Yes, sir. Okay. So – but when – after the rezoning occurred and foreclosure was – the properties were in the middle of foreclosure and had not been finalized. Is that correct? I would not say in the middle, ma'am. The foreclosure occurred 60 days after the rezoning. Now, there was some – there was some concern about foreclosure, but remember that the bank itself appeared at the December 5, 2011 city council meeting and said – they appeared with Mr. Charles Givienpore, who at the time was the owner, Mr. Givienpore's attorney, and the bank appeared and said, please don't do this. There's a lot of money invested in this property. If you do this, it will result in financial hardship or financial ruin, whatever the exact words they use at the city council meeting. But it was very clear in the minutes of the city council meeting that those three individuals appeared and begged the city not to do it. So, having said that, going back to the futility, I mean, there's – the city's ability to make a profit is predicated upon them being able to sell these lots. And with the undisputed testimony that we've got, the fact that the city did not put on any evidence that they could be developed at R2, even with some sort of variance, taking all that into consideration, South Grandview cannot go forward even testing this wild theory. They would be putting their entire investment at risk simply to test a speculative and wild theory that they – that the city says we don't know what they would have done or they may have done this. It's all speculative. If you look at the Williamson case and Newport Largo, two cases that the city has relied upon, there was actually evidence. In the Williamson case, there were several different variances that they put into evidence that the landowner could have pursued. And you can read in the opinion that they did not take advantage of those variances that were actually put into evidence that the landowner could have pursued. Likewise, in Newport Largo, they said that the record reflected that there were other avenues or less intensive things that the landowner could have pursued. You don't – your client doesn't own the property anymore, correct? I'm sorry? Your client doesn't own the property anymore. Well, it's been – no, there's a small portion that – there were several different banks or several different portions of the property. There was a small part that they still do own, but the vast majority of it is bank-owned. So if we were to render a decision that said this wasn't a final decision, there's not much your client can do after that, correct? Well, there was – yes, I believe there is. You could go back – the SGV could go back and renegotiate with these banks. They've been doing business with these banks for many years. And I think it's a testament to their relationship with the bank that the bank actually appeared with the city council and said, please don't do this. So they could go back to the bank and say there has been a taking. We're awarded a judgment. They could negotiate new terms. Well, that's – I mean, I suppose that's assuming that the city would rezone to R-4, but if the city can't – if the city won't rezone to R-4, if it remains at R-2, then there's really not a whole lot that can be done because, I mean, everybody's in agreement it can't be done at R-2. What I may – if I may move on to their second argument, they may address this in rebuttal. The arbitrary and capricious argument. I think their brief was overreaching in that it called – it called – we set forth some reasons or non-reasons for the rezoning, and they called that an arbitrary and capricious standard, but we never used arbitrary and capricious. Just the jury – the special jury verdict form only allowed for them to assess the fair market property before and after the taking. And what we've referenced in our brief is that character of the government action does assess reasons. And in the Tahoe Sierra case that the city has cited, parts three and four of that opinion go into some detail about that reasons for the rezoning can be considered. It actually – it discussed – it put the Lucas case and the Penn Central case up against each other, and it says Penn Central necessarily entails complex factual assessments of the purposes and economic effects of government actions. And the purposes, that's clear cut. They also said – the Tahoe Sierra court also said, comparing the Lucas case with the Penn Central case, said under the Penn Central case – or under the Lucas case, there's no need to evaluate all of the factors. It's a categorical taking. Under the Penn Central case, there is a need to evaluate the importance of the public interest served by the regulation or the reasons for imposing the temporary restriction. The city, in their responsive brief, stated that that may go to the – whether this is a physical taking or versus a regulatory taking. And I would submit to the court that it would be redundant to go back over that, because when you're talking about a Penn Central analysis, you're talking about three factors. The economic impact of the regulation on the landowner, the character of the government action, and the interference with investment-backed expectations. Now, that's a Penn Central analysis. And then they talked about the Lucas, which is a categorical and complete taking. When it falls short of destroying all value to a piece of property, the court proceeds to the Penn Central analysis. But I submit that we're way beyond whether this is physical or regulatory. The mere fact that we're talking about a Penn Central case, Penn Central analysis, necessarily implies that it has been a regulatory action. It would be redundant to go back and say, okay, character of the government action, are we talking about regulatory versus physical? We're way past that. But when you're looking into the motive behind the rezoning, aren't you running square and dilingual where the court said that an inquiry into whether a regulation substantially advances a legitimate state interest is an inappropriate test for deciding if a regulation is a taking? No, are you referring to the Chevron case, ma'am? Yes, ma'am. The Chevron case, and what was, I think the Chevron case was kind of later on explained a little bit more in the Muir v. Wisconsin, is that that was a means-end test. And the Muir court said that the reason that Chevron overruled that part was because it required the court to delve in too far into the effectiveness of the regulation, not necessarily the reasons. And in the Chevron opinion, they got way in the weeds about whether or not, it was a gasoline regulation, and they talked about profit margins and how this was going to affect the customers. And they got way into the weeds about the effectiveness of the regulation, and that's why the court had to come back and correct course and go back to the Penn Central analysis. So in any event, the court admitted evidence about the city's motivation and reason for rezoning Section 16, and you're saying that there was, the court did not abuse its discretion in determining that the motivation was relevant to determining whether or not this was a regulatory taking. Is that your argument? Yes, sir. Yes, sir. And also, that instruction in response to Judge Branch's question, that instruction was actually given at, I understand it was given to the jury. That was without objection, and the city did not raise that in the principal brief. But, so, I mean, some of this evidence will overlap. The reasons, I mean, after all, we're still dealing with the last little line of the Fifth Amendment, which in the court has carved out a few different, several different causes of action just related to this one line. So the motives, yes, can be relevant when it refers to the character of the government action. And the reasons for doing so, and by the way, the counsel for the city in his opening argument referred to the reasons for the regulation. And, I mean, I'm not aware of where somebody requests a standing objection and then also is the first one to inject the issue. They said that it was not a smart idea to begin with because it had, you know, it misplaced the denser properties. And they also said that there was concerns about the foreclosure. So, I mean, but… I think we have your argument. Okay, thank you very much. Your Honor, just briefly back to the ripeness issue. You have the zoning ordinance that's in evidence. There are other categories in that zoning ordinance for residential properties other than R4 that they wanted but didn't have and R2. There is R3, for instance. There has never been, so to come in and say it's R4 or it's R2, no. There are, you have 142 acres. Maybe you come in with a plan that has a combination. The fact is that… Except the ordinance said only R2. Your Honor, but we were talking about the requirement in the case law that says you have to come back and you have to make an application. We have to figure out what it is, what kind of concrete plan is going to be permitted. But again, the Greenwood or Greenville or whatever case it was indicated, you know, variances are nice but you can't do something in a variance that would outright. It sounds like you've made a decision in your city. R2 is what we want and you want them to come back and then say, yeah, but would you change your mind? I don't know that you're wanting them to do that means that your original decision was not a final decision. And, yes, Your Honor, the case law does say that we're required to come back, you're required to come back, and you have to look at the specific situation, the specific facts. And the facts of how this rezoning came about, you had no plan, nothing. The property was in foreclosure. It had not been foreclosed upon, but it was in foreclosure. We know that. And so if the SGV had come back. And you did according to them at the city meeting where you did the ordinance, you had the bank and everybody saying, please, please don't do this. They're supposed to come back a second time and say, please, please. If they come back with a plan, come back. If they had been there with a plan, we don't know what would have happened if they said, okay, we're ready to go forward. Bank says we're not going to, we're going to renegotiate the loan. We're going to redo the terms. Then something may have been different. But if I may. Were these arguments made to the jury? I'm sorry, which arguments, Your Honor? That all they needed to do is come back and describe what the changes are to the section, sector 16? Your Honor, those were not made to the jury because they go to the standing to begin with, Your Honor. And if I may, just going to the evidentiary part, the idea that you can bring in evidence, and it was all about bad motive of the city to rezone it. They talked to. Not you have in any trial you allow context. In criminal context, we call it race jest. So you're talking about a rezoning, and it's typical that when that's going to be brought up, somebody's going to explain a little bit what happened and a little bit what the reasons were instead of just presenting the jury with low charts and numbers, just some background. You have opposition to the jury hearing anything at all about why you all chose to rezone the property. Your Honor, I have. Yes, Your Honor. Under these circumstances, we do. Because it was so badly done? I mean. Your Honor, because, no, not at all. But because we're in a, you have to look at what Fifth Amendment. They're asking for damages for a 100% complete taking. In order to have that, there is a presumption then that you have the legitimate governmental basis. I cite the court to Eastern Enterprises v. Apfel, which is Justice Kennedy's concurring opinion, that says you've got an underlying assumption that you've got a constitutional base. I'm asking, again, what is wrong in any trial? I've never seen a trial where you just come in with numbers, and there's not some witness or some context given to at least let the jury know what we're talking about. I don't know how much one goes into that, but at least you're saying that it was verboten to get into anything about the zoning or why you did it or the process. Your Honor, and I do believe that it is because they tried to paint the city as being unkind, unfair in the closing. Well, what about his argument that you started it with your own witnesses? You were actually, why would you have the witnesses up there? They had nothing to say, did they, if they weren't allowed to talk about the zoning? Your Honor, my colleague had talked about the opening argument, and in the opening argument, the court, in a motion in limine, the court had already ruled this evidence was coming in. So I understand then you relied on that ruling and you preempted that. Did you call these witnesses, these city witnesses, or did they call them? No, they called them. And, Your Honor, no, and it was, and then the judge, we had a standing objection so that we didn't have to, whether it would have been a standing objection because the motion limiting. Well, let's talk about the harm to this. Let's assume that it would have been a better choice for the judge to say, let's not get into the motivation too much. But the harm to you would be your fear that it would be so inflammatory that the jury would be monetizing this and awarding damages based on the fact they don't like the city as opposed to based on actually trying to monetize what the dollar amounts would be, whatever. And so, but based on what I've seen, it appears that the jury, they asked for $5 million or something based on whatever their experts said. The jury came in much lower than that, which, would that not suggest that there was no prejudicial impact to this, that the damage was not such that you should warrant a new trial? And, Your Honor, we don't know what the basis of the jury's verdict is, but I dare say that a $3 million verdict against the city of Alabaster is a significant verdict. But didn't their experts, just the raw numbers, what it's worth now, $200,000 now versus what it would have been worth before the zoning, those figures justified that number, did they not? And, Your Honor, there wasn't an expert who testified about that. It was the... Or whatever they had for the estimates. Right, Your Honor. But may I address your issue very specifically about what's the harm? Well, let me just read to you, this is page 568 from the transcript, and this is in the closing argument from the plaintiffs. It wasn't until December the 5th, 2011, after almost substantially the whole subdivision had been completed that the city of Alabaster pulled the rug out from under us and caused us to lose whatever money we had invested. I submit to you, ladies and gentlemen, that what the city of Alabaster did offends your sense of fairness. What does the city of Alabaster do? They kicked them when they were down, just as we were trying to emerge from the recession. Why did they do it? Why was SGV singled out for this kind of treatment after all SGV had done for the city of Alabaster? Not one time other than this, et cetera. Was it something that they did, something that they didn't like Mr. Giviampore said in a meeting? Not one word was asked by the city about how this was going to... You have people saying, don't do this, it's going to ruin us. Mr. Shimpaw and Mr. Riles, who are city witnesses, their demeanor on the witness stand, I think you can say that they kind of hung their heads a little. I think they were embarrassed that they had made these decisions without even going out to the property, et cetera. Your Honor, the whole purpose of that testimony was to try to inflame the jury and then to go back and tell the jury, and it's not appropriate for a Fifth Amendment takings case to tell the jury there's no legitimate reason, they shouldn't have done it, they feel guilty, you saw them hang their heads and without... They didn't say punish the jury, but clearly... Punish the city, but clearly... And in a Fifth Amendment takings claim, when you're asking for complete takings, that evidence is completely inappropriate and how it was used in this case demonstrates how it was inappropriate. Thank you. Thank you, Ms. Mayne. Mr. Pino.